Filed 5/28/13  P. v. Ahumada CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARCOS AHUMADA,<br><br>    Defendant and Appellant. | B240577<br><br>(Los Angeles County<br>Super. Ct. No. PA070015) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Cynthia L. Ulfig, Judge.  Affirmed.

Angela Berry-Jacoby for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant Marcos Ahumada of criminal threats (Pen. Code, § 422) (count 1); assault with a firearm (Pen. Code, § 245, subd. (b)) (count 2); carjacking (Pen. Code, § 215, subd. (a)) (count 3); evading a peace officer (Veh. Code, § 2800.2, subd. (a)) (count 4); and vandalism (Pen. Code, § 594, subd. (a)) (count 5). In counts 1 and 2, the jury found that appellant personally used a firearm within the meaning of Penal Code section 12022.5. In count 3, the jury found that appellant personally used a firearm within the meaning of Penal Code section 12022.53, subdivision (b). In count 4, the jury found that appellant drove with a willful and wanton disregard for the safety of persons and property. Appellant admitted various prior conviction allegations. The trial court sentenced appellant to state prison for a total of 44 years eight months.

Appellant appeals on the grounds that: (1) the jury was improperly given a general intent instruction relating to the evading a peace officer charge; (2) the jury was improperly given a general intent instruction relating to the criminal threats and carjacking charges; (3) the trial court should have given a unanimity instruction with respect to the assault with a firearm charge; (4) the trial court improperly allowed evidence of appellant's gang membership, including testimony by a gang expert; and (5) there was insufficient evidence to support the guilty verdicts on counts 1, 2, and 3.

We affirm.

## FACTS

**Prosecution Evidence**

On February 14, 2011, at about 6:45 in the evening, Rosa Zetino stood talking to her neighbor, Benny Rodriguez, in the courtyard of the apartment complex where they lived at 8220 Langdon Avenue in Van Nuys. Appellant entered the courtyard from the rear, walked up to Zetino, pulled a gun, and pointed it at her face. He said to Zetino either "I'm going to blast you and your family," or "I'm going to come back and blast you and your kids." Appellant then exited the complex, got into the passenger side of a white truck, and left the area.

2

Zetino and some neighbors called the police. Zetino was shocked and afraid because of appellant's threat. Immediately after the incident, another resident of the apartment complex approached her and told her that appellant was a gang member who went by the name of "Bouncer." Zetino had seen appellant before when he came by to retrieve his mail, since he used to live in the apartment she now occupied, though it had been approximately 10 years prior. At the time of trial in January 2012, Zetino was still afraid as a result of the threats made in February 2011.

At around 6:51 p.m. on February 14, 2011, the same night as the incident involving Zetino, Loxi Greenfield entered a parking lot of a Baptist school in North Hills, driving her 2006 GMC Yukon. As soon as she parked and opened the door of her vehicle, appellant appeared and pointed a gun at her face. He said, "Bitch, get out of the fucking car. I'm going to fucking kill you." Greenfield nervously fumbled some papers in her hand and appellant repeated his command. Greenfield then put down her papers, got out of her vehicle, and walked a short distance away. Appellant entered the vehicle but was unable to find the key. He walked back toward Greenfield, and pointing the gun at her, said "Bitch, where are the fucking keys?" and "I'm going to fucking kill you." Greenfield told him that the keys were in the console. Appellant got back in the vehicle, drove over the curb, and left. Greenfield left her purse, containing approximately $180 in cash, in the vehicle. The police were called on Greenfield's behalf.

Los Angeles Police Officer Jorge Esquivel and his partner, Officer Green, were in an unmarked police car about 7:30 that evening when they received information that a carjacking occurred, and that the vehicle was located at a gas station at the corner of Sepulveda and Roscoe Boulevards. Officer Esquivel drove to the gas station, parked the police car near a gas pump, and walked to a pay phone. He saw the GMC Yukon parked near a cinder block wall about 20 feet from the gas pumps. He then noticed appellant standing across the street near some garbage cans, looking around. Eventually, appellant darted across the street and walked into the gas station, where he had a brief conversation with the clerk. Appellant asked the clerk if there were any police around, and the clerk responded that he did not see any.

3

Appellant then got into the GMC Yukon and drove out of the gas station parking lot. Officer Esquivel returned to his vehicle and began to follow appellant, while broadcasting details of the pursuit to awaiting officers.

Officer Peter Doomanis joined the pursuit in a marked patrol car. As appellant drove by his car, appellant looked directly at him. Officer Doomanis turned on his lights and sirens, and appellant immediately accelerated to 60 to 80 miles per hour while driving through a dense residential area. Appellant passed cars on the wrong side of the street and blew through a stop sign and a stop light, barely missing pedestrians, including a man in a wheelchair. Officer Doomanis had to slow down at an intersection and lost sight of appellant.

Officer Dennis Padgett apprehended appellant after he crashed the Yukon and took off on foot. Appellant was handcuffed and placed alone into the backseat of the police car. About five minutes later, Officer Padgett heard a popping sound coming from the car and observed that the top of the part of the window had been detached from the rear passenger doorframe. He saw appellant lying on the rear seat with his feet up in the air.

Rodriguez and Zetino were transported to the place where appellant was detained, and both identified him as the person who had pointed the gun at Zetino. Greenfield was also brought to view appellant, and she identified him as her assailant, saying, "Yeah, that's definitely him." Appellant was searched, and $181 was found in his pockets. No weapon was recovered.

**Defense Evidence**

Appellant, who previously had been convicted of grand theft and residential burglary, testified on his own behalf. He testified that on February 14, 2011, he went to the apartment complex at 8220 Langdon Avenue in Van Nuys, where he had a conversation with a woman named Bridget. He had "an incident" with Bridget, and he saw a person who had tried to kill him a month before, so he jogged away from the apartment building. Appellant saw some people he knew driving down the street, and he got a ride home from them.

4

Appellant arrived home at approximately 6:50 p.m.  He went upstairs to his apartment and then downstairs to the laundry room to do laundry.  When his laundry was done he went back to his apartment where he drank "a couple beers."

At around 8:20 p.m., an acquaintance named Nathaniel Marquise Petrill, also known as Deuce-Deuce, and a man who goes by the name "Smokey" came by appellant's apartment.  Deuce-Deuce told appellant that he had argued with his girlfriend and she had called the police, so he left her car, which he was driving, at a gas station.  Deuce-Deuce asked appellant if he could pick up the car.  Appellant agreed, and Deuce-Deuce drove appellant to a spot across the street from the gas station, gave him the keys, and left appellant to pick up the car and drive it back to his apartment.  Appellant walked over to the gas station and retrieved the car, after first asking the gas station clerk whether a woman had called the police.  When appellant realized he was being pursued by police, he "panicked" because he did not have a license, and because Officer Padgett, a member of the Crash Unit Gang Task Force, had threatened appellant a month before that the next time they caught him they were going to set him up.

Appellant admitted that he broke the police car window after he was arrested.  Appellant also admitted that in a phone call after his arrest he told his Mother:  "It's just that I know I'm going to do time.  So in my mind, my mindset is not, 'Oh, I am going to get out.'  Oh, no, no.  I know I'm heading over there.  So I'm not even worried."  Appellant made the statement to his mother because she was sick and he did not want to worry her.

Appellant testified that the first time he had ever seen Zetino was at the preliminary hearing and that he had never met Rodriquez.  He also testified that he did not take the vehicle from Greenfield.

**Prosecution Rebuttal Evidence**

Officer Padgett testified that he had never seen appellant before the night of February 14, 2011.  He had never worked with the Crash Unit which, in any event, had been disbanded years ago.  Officer Padgett was not involved in the vehicular pursuit of

5

appellant, and the first time he came into contact with appellant was when he saw him running down the street.

## DISCUSSION

### I. Instructions Relating to Evading a Peace Officer

Appellant contends that the trial court committed reversible error by instructing the jury with CALCRIM No. 250, a general intent instruction, on the fourth count for felony evading. The trial court stated that for the jury to find appellant guilty of evading, "that person must not only commit the prohibited act or fail to do the required act, but must do so with a wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act or fails to do a required act; however, it is not required that her or she intend to break the law. The act required is explained in the instruction for that crime or allegation."

A person violates Vehicle Code section 2800.2, subdivision (a), if he "flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property . . . ." Vehicle Code section 2800.1 is violated by a "person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle . . . ."

Appellant asserts that felony evading is a specific intent crime. Based on the statutory language, he is correct. "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456-457; *People v. Atkins* (2001) 25 Cal.4th 76, 82.) The language "with the intent," which appears by reference to Vehicle Code section 2800.1 in Vehicle Code section 2800.2, "typically denot[es]" a specific intent crime. (*People v. Hering* (1999) 20 Cal.4th 440, 446.)

6

Thus, the trial court erred by instructing the jury with CALCRIM No. 250, which defines general intent, instead of CALCRIM No. 251, which defines specific intent. Nevertheless, we do not find that this erroneous instruction requires reversal. Such an error is not structural, requiring automatic reversal, but rather is subject to the harmless beyond a reasonable doubt standard expressed in *Chapman v. California* (1967) 386 U.S. 18. In *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1153-1154, the California Supreme Court found that a general intent instruction given for the crime of threatening an executive officer was harmless beyond a reasonable doubt because there "was evidence that defendant harbored the requisite specific intent." Similarly, in *People v. Wilson* (2008) 44 Cal.4th 758, 803-804, harmless error was found even though written jury instructions for a killing with torture special circumstance allegation omitted the element that the defendant intended to torture the victim. (See also *People v. Lee* (1987) 43 Cal.3d 666, 669 [appropriate standard is "'harmless beyond a reasonable doubt'" test when jury receives contradictory, and partially inaccurate, specific intent instructions]; *People v. Zerillo* (1950) 36 Cal.2d 222, 231-232 [jurors were not misled by failure to give specific intent instruction].)

In this case, the relevant circumstances and evidence clearly establish that the jury's verdict of guilty on the felony evading charge was not attributable to the problematic jury instruction. First, the jury was also instructed with CALCRIM No. 2181, which required them to find that appellant "willfully fled from or tried to elude the officer, intending to evade the officer." Thus, contrary to appellant's assertion, the jury would not have believed that appellant's act of driving was the only evidence required to find intent. Second, appellant himself testified that he "panicked" when he saw the police and drove away quickly because Officer Padgett had threatened to set him up. He also admitted to saying to a detective, "I was afraid to go to jail, so I fled when the police got behind me." This evidence plainly shows that appellant drove with the intent of evading

7

the police.[1]  Third, during closing argument, appellant's counsel conceded guilt of this crime, saying, "As to the counts 4 and 5, we've already basically told you not to bother with those as far as the defendant is concerned."

Therefore, even though the trial court erred by instructing the jury with CALCRIM No. 250 on the intent to evade a peace officer charge, the error was certainly harmless beyond a reasonable doubt.

## II.  Instructions Relating to Criminal Threats and Carjacking

Appellant argues that there were similar instructional errors with respect to the first count of criminal threats and third count of carjacking.  As with the felony evading charge, the jury was instructed with CALCRIM No. 250 for both the criminal threats and carjacking charges.  For both of these charges, however, the jury was also instructed with CALCRIM No. 251, as follows:  "For you to find a person guilty of the crimes in this case of carjacking, criminal threats, and vandalism, that person must not only intentionally commit the prohibited act but intentionally or unintentionally fail to do a required act, but must do so with the specific intent and/or mental state.  The act and specific intent or mental state are explained in the instruction for that allegation."

Criminal threats and carjacking are both specific intent crimes.  (See Pen. Code, §§ 422, subd. (a), 215, subd. (a).)  Therefore, it was error for the trial court to instruct the jury with CALCRIM No. 250.  (See *People v. Lee*, *supra*, 43 Cal.3d at p. 672.)  Nevertheless, we find that the error was harmless beyond a reasonable doubt.

The jury was instructed with CALCRIM No. 1300 on the criminal threats charge, including the requirement that "the defendant intended that his statement be understood as a threat and intended that it be communicated to Rosa Zetino."  For the carjacking charge, the jury was instructed with CALCRIM No. 1650, which included the elements that "when the defendant used force or fear to take the vehicle, he intended to deprive the other person of possession of the property either temporarily or permanently," and "the

---

[1]  Appellant's vague assertions that he was voluntarily intoxicated and may have not been able to form the requisite specific intent are belied by this and similar evidence.

8

defendant's intent to take the vehicle must have been formed before or during the time he used the force or threat or fear. If the defendant did not form this required intent until after using the force or fear, then he did not commit a carjacking." Thus, given these clear instructions, the jury could not have been confused about the intent required to find appellant guilty of criminal threats or carjacking.

Moreover, the evidence overwhelmingly established that appellant had the requisite intent for both of these crimes. The evidence that appellant pointed a gun at Zetino's head and stated "I'm going to blast you and your family," or "I'm going to come back and blast you and your kids," showed that appellant intended the statement to be understood by Zetino as a threat. The evidence that he pointed a gun at Greenfield's head, said "Bitch, where are the fucking keys?" and "I'm going to fucking kill you," and then drove away in Greenfield's vehicle showed that he intended to deprive Greenfield of the vehicle, and that this intention was formed before or while he used fear to take the vehicle. Appellant has not argued, either below or on appeal, that the element of intent was not proven. The trial court's error in instructing the jury with CALCRIM No. 250 for these charges was clearly harmless beyond a reasonable doubt.

## III. Assault with a Firearm

Appellant next argues that the trial court erred by failing to give a unanimity instruction with respect to the second count for assault with a firearm. He contends that although the prosecution intended that the charge pertain to appellant's assault against Zetino, the charge could have just as easily pertained to the acts committed against Greenfield, and that the jury was never properly instructed as to what events constituted the crime.

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant

9

will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) In cases presenting a risk that the jury could amalgamate evidence of multiple offenses to conclude that there is sufficient evidence to convict on one count, a unanimity instruction may be required. (*Ibid.*) Appellant contends that such an instruction was required here.

A unanimity instruction is not required when the prosecutor elects which act amounts to the charged crime. (*People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455 ["Because the prosecutor's opening argument elected what conduct by defendant amounted to the crime charged, we conclude that no unanimity instruction was required"]; *People v. Diaz* (1987) 195 Cal.App.3d 1375, 1383.) In *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292, and *People v. Mayer* (2003) 108 Cal.App.4th 403, 418-419, the court analyzed the statements made in the prosecutor's opening and closing arguments to determine that the prosecution made an election for jury unanimity purposes, thereby obviating the need for a unanimity instruction.

An election was likewise made in this case. Prior to jury selection, the jury was told that the crime of assault with a semiautomatic weapon (later changed to assault with a firearm) was committed against Zetino. The prosecutor also made clear that the charge pertained to the act against Zetino. In his opening argument, he stated that "there's an assault and a criminal threat that just takes place here at Miss Zetino's house" and "I've no doubt that you will convict the defendant for the crimes that he's charged with for assaulting an unarmed woman for no reason, for threatening to blast her, to come back and blast her and her family, for carjacking another completely unarmed woman and in completely unprovoked situation [*sic*], and for leading police on an extremely dangerous high-speed pursuit through residential streets." Furthermore, in closing argument, the prosecutor stated that the assault with a firearm charge "has to do with Rosa Zetino when he pointed his handgun at her head and—and threatened to come back and blast—or threatened to blast her and her family. This is—this is the count that this refers to."

Thus, because the prosecutor made a clear election, no unanimity instruction was required.

10

## IV. Gang Expert Testimony

Prior to trial, the defense filed a motion to exclude any reference to appellant's gang affiliation or gang moniker, on the ground that such information was unduly prejudicial and irrelevant. After hearing opposition, the trial court denied the motion, finding that the information would be relevant both to identification and to the "sustained fear" element of the criminal threats charge.

Later, at trial, the prosecutor elected to call a gang expert solely to elicit a statement that appellant is a member of the Toonerville gang, because, according to the prosecutor, such information would be relevant to prove "sustained fear." The trial court allowed the gang expert to testify. The testimony by the expert, Officer Christopher Phillips, was brief. He stated that he had been assigned to "work" the Toonerville street gang for about four to five months, and he identified appellant as a member of the Toonerville gang.

Appellant argues that he was denied the right to a fair trial and to due process when the trial court admitted evidence that he was a gang member, and that it was abuse of the court's discretion to allow the expert to testify. Our Supreme Court has recognized that evidence a defendant is a member of a gang can have a "'highly inflammatory impact'" on the jury, and that such evidence should be carefully scrutinized by the court before it is admitted. (*People v. Champion* (1995) 9 Cal. 4th 879, 922.) Nevertheless, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

We find that the evidence of appellant's gang membership here was relevant to the "sustained fear" element of the criminal threat charge. Penal Code section 422, subdivision (a) states, in relevant part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, . . . which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in

11

sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment . . . ." Sustained fear is fear that extends beyond a "momentary, fleeting, or transitory" period of time. (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

Evidence of appellant's gang membership was relevant to prove sustained fear in part because of the open-ended nature of appellant's threat. Penal Code section 422 "does not require an immediate ability to carry out the threat." (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679.) Whether appellant said "I'm going to blast you and your family" or "I'm going to come back and blast you and your kids," the implication was that at some point, either presently or later, Zetino and her family would be harmed. Thus, Zetino's fear was not just momentary. Instead, it was a sustained fear—she testified that she was still in fear at trial, nearly a year after the incident.

Further, Zetino's testimony that soon after the incident she was told appellant was a gang member did not make the gang expert's testimony unnecessary. Zetino could only testify that she had heard appellant was a member of a gang; she had no independent knowledge of that fact. An expert was required to testify that appellant actually was a gang member. The fact that appellant was a gang member made Zetino's sustained fear more reasonable and more likely to be true, and the evidence thereby provided further support to the criminal threat charge. Thus, we find that the probative value of the evidence of gang membership was not outweighed by its potential prejudicial effect, and the trial court did not abuse its discretion by allowing such evidence.

## V. Sufficiency of the Evidence

Appellant asserts that the identification evidence was insufficient to support the guilty verdicts on the first count of criminal threats, the second count of assault with a firearm, and the third count of carjacking.

"The standard of appellate review for determining the sufficiency of the evidence is settled. '"On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find

12

the defendant guilty beyond a reasonable doubt."'" (*People v. Wilson*, *supra*, 44 Cal.4th 758, 806.) We do not reevaluate witness credibility or resolve evidentiary conflicts, as these are matters exclusively for the jury to decide. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 602.) "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."'" (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Appellant bases his argument that the identification evidence was insufficient on discrepancies between Zetino's and Greenfield's description of him. Zetino described the suspect who threatened her as wearing a blue and white plaid short-sleeved shirt, light blue jeans, and a plain navy blue baseball cap, and said he held a shiny silver pistol. She described him as a male Hispanic, bald with brown eyes, approximately five feet 11 inches, and 190 pounds. Greenfield, on the other hand, said the suspect was wearing a black baseball cap, a plaid bluish-gray shirt, and solid-colored pants that she believed were khaki-colored. She said the suspect held a dark-colored gun. She described him as approximately six feet three inches. Evidence showed that on the night of the incidents, appellant was six feet one inch tall.

None of these minor discrepancies leads to the conclusion that there was insufficient evidence to support the verdicts. Both crimes were committed outside, and both were committed after 6:30 p.m. on a February night. It could only be expected that witnesses would have somewhat varying accounts of a suspect's description given such conditions, particularly after they both had guns pointed at their heads. Moreover, Zetino, Greenfield and Rodriguez all identified appellant as the perpetrator, both in court, at trial, and during a field showup on the night of the crimes. "Purported weaknesses in identification testimony of a single eyewitness are to be evaluated by the jury." (*People v. Elwood* (1988) 199 Cal.App.3d 1365, 1372.) Nothing in the record compels us to reevaluate the jury's determinations.

We also find meritless appellant's argument that there was insufficient evidence to convict him on the assault with a firearm charge because there was no evidence the

13

firearm he used was loaded. An assault with a firearm "requires the present ability to inflict a violent injury." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) But "California courts have often held that a defendant's statements and behavior while making an armed threat against a victim may warrant a jury's finding the weapon was loaded." (*Id.* at p. 12.) Zetino testified that appellant pointed a gun at her head and said, "I'm going to blast you and your family." This statement could reasonably have been interpreted by the jury as an admission by appellant of his present ability to inflict violent injury on Zetino. (See *ibid.*; *People v. Mearse* (1949) 93 Cal.App.2d 834, 837.)

## **DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

14